Ready? Yes. Good morning, Your Honor. Timothy Scott for the appellant, Ronnie Fekrat. This case originated as a 2255 petition in which this court granted a certificate of appealability. The issue that this court granted a certificate on was specifically whether the government knowingly allowed false testimony regarding Chris Johnson, who was a cooperator, and his benefits for cooperation to go uncorrected. Now, I wish I could stand here and tell the court that the record below conclusively proves that there was false testimony that went uncorrected and that the facts were overwhelming and carried the burden for the petitioner. I can't do that as I stand here. But the reason why I can't do that, I think, is really the heart of this case. You're an honest man. I try to be, Your Honor. The reason I can't say that is because there was a factual conflict at the district court which went unresolved. There were a couple mechanisms by which the district court could have resolved what was a fairly stark factual conflict. But the district court declined to do that. And that, I think, is the most glaring error in the district court below. This case boils down to an account from an attorney who was representing Mr. Fekrad in subsequent proceedings, or after the actual trial, in which this attorney recounted a conversation with the cooperator's attorney. In this conversation, according to this account, the attorney acknowledged that there was a plea agreement for a six-month sentence and went on to explain how that was ended up being half of what the cooperator actually received. Now, that statement, if true, would be in complete impeachment and in stark contrast to what the cooperator How junior was this associate? I'm sorry? How junior was this particular associate? It seems it was a relatively junior associate. I don't think it was a partner or anything of that nature. Right? And the government does make some hay with that in their response and suggests that this person was unknowledgeable about Federal law or Federal criminal law and was inexperienced. Was there any indication in the record as to what kind of experience she had in the practice of criminal law, criminal defense? There wasn't one way or the other. I think the government reads a lack of inexperience in. I don't think it's supported one way or the other. The reason I think that even if this person did turn out to be inexperienced in Federal criminal law, I don't think that carries the day for the government. And the reason for that is she's not indulging some sort of a complex Taylor analysis or modified categorical approach to something. What she's simply doing is saying the attorney told me there was a plea agreement for six months. I mean, it's that factual statement that it's a plea agreement for six months that's in complete tension with the cooperator's testimony at trial. As in virtually every trial, I'm sure the Court has seen this many times, there was an elaborate presentation of how no promises were made. They would have to wait and see. He was giving this testimony because it was the truth, and he would have to see how it unfolds after that. Kagan. You've got Jan Hanslick, one of the most well-known defense attorneys in town. He reads this e-mail. He goes to the sentencing and he was counsel at sentencing, correct? Yes. And obviously whatever representation was made in this e-mail didn't make enough of an impression on him and his experience to raise the issue in any way. What do you make of that? So you've got this one stray statement out there. You've got all the other evidence to the contrary that there was no deal, including the fact that Jan Hanslick never made an issue of it, and the AUSA who purportedly entered into the deal declared under oath that there was no such deal. The defense attorney with whom he purportedly had the deal said there was no such deal. It's contrary to the recommendations made at the sentencing. So in light of that, why is an evidentiary hearing even necessary? Let me see if I can work backwards through that list that the Court gave. The first one, that this was contrary to the recommendations that were made. I think that was a factual error, respectfully, on the part of the district court. The government's recommendation was, in fact, six months. So that actually corroborates perfectly and exactly what the associate had recounted as being the deal. So the fact that the government recommended precisely what she said they were going to, or what they did, I think actually corroborates the email. Now, the fact that the district court ended up sentencing Mr. Johnson higher, well, that just is evidence of the fact that the district court is not bound by the government's recommendation, which, as we know, is always the case unless it's an 11C1C deal. The fact that the defendant recommended lower also doesn't impeach that, because as we all know, most times the government's recommendation is what it is, and then the defense has leave to ask for less. So it's the government's recommendation that's the heart of any plea deal. And the fact that the defendant had leave to request additional adjustments or departures I don't think impeaches that in any way. Now, I think the question the Court asked before that isn't the weight of the evidence against this email. As to Mr. Hanslick, again, you know, I can't speak to his reputation or whether or not, I mean, it's frankly not in the record. I take the Court at its word that he's a well-respected attorney. Talking about Hanslick? Yes. He's been around a long time. Sure. And I take that as fact. But the statement that he gave is simply that he didn't remember the email, and he didn't remember what it meant. So it wasn't exactly a firm denial that that happened or a firm denial. I know that. But you've got, I'm assuming the district court was well aware of who Jan Hanslick is. You've got a CC to Mary Andrews, an ex-AUSA, highly experienced counsel to both of them. They've got obligations to the defendant in terms of sentencing. If they've got a secret deal, one would have thought that one of them would have raised that. You would think so. Practically IAC not to. Well, and that is exactly Mr. Fekrat's claim. I mean, that's the claim that he raised in the 2255 petition, is that he was ill-served by his attorneys. I mean, really most of his petition, or a great deal of it, was specifically an IAC allegation, and the fact that his attorneys didn't do what they ought to have done in light of the facts of the case. So I think it would be, I'm not aware of any precedent where we can say such-and-such attorney did not commit IAC because this person has been around a while and is known to be a good attorney. I think that we have to go off the record. I don't know if it's in the record or not as to, and if it is, I don't have it in my mind right now as to why Ms. Finch's declaration wasn't obtained. Well, that's the million-dollar question. Mr. Fekrat made a specific discovery request, or made a specific request, to the district court and said, at a minimum, please allow us to serve interrogatories on Ms. Finch. This is at pages 45 and 46 of the record. Now, even if the court feels that an evidentiary hearing, a full-blown hearing, wasn't appropriate, at a bare minimum, it seems when we have a factual conflict like this, it would have been appropriate. In fact, I would suggest that it's required to get Ms. Finch's side of the story. And those specific interrogatories were proposed. Unfortunately, the district court denied them. He denied the opportunity for any explication, any elaboration on her part as to what this meant and what was said. I think that having – yes, we can describe this as a stray email that is somewhat doesn't tell the whole story, but it doesn't tell the whole story because the petitioner's request to have the whole story told were denied. So if she wasn't allowed to take the witness stand, if she wasn't allowed to answer these questions under oath, I don't think that Mr. Fekrat can be faulted for not having the record that he might otherwise have. And that's really, as I say, the heart of the appeal is there should at least be an evidentiary hearing, and if not, there should be some written discovery that was propounded. Now, I don't know what the government will share with us as to whether or why they didn't include her declaration. Maybe they got one from Mr. Hanslick where he doesn't remember anything, and then, of course, they got the declarations from himself and from the defense attorney. But again, I would suggest that those declarations were sort of the state of the record before the revelation of this email. I mean, it was in the plea agreement, and it's part of this sort of standard posture that there's no promises made in part of the plea agreement. But what this email revealed was that there, in fact, was either a wink and a nod, or that there was some unstated agreement that contradicted that. So I would suggest this isn't like new evidence that arose to contradict the email and the account from Ms. Finch. It's rather the position that they'd taken all along. And the question was, does this new email and this new information create enough of a factual conflict that the district court should have resolved it in some more meaningful way? Finally, the district court, I think, undertook or committed a legal analysis error in holding in the alternative that this would not have affected the outcome of trial. First, factually, this case had been tried once and resulted in a hung jury. Now, granted, that was against Mr. Johnson rather than Mr. Fekrat. But the government has been down this road of trying to prove up their case circumstantially and without a firsthand witness who can say, yes, this is what happened. This is the person. Am I correct that the email was sent after the trial? Yes, Your Honor. And your interpretation of the email is that it's referring to some kind of agreement that was reached before trial. Yes. And the reason that's my interpretation is because it says specifically plea agreement. If it had said sentencing agreement or post-trial agreement or respective sentencing recommendations, that might be a different matter. But it uses the words plea agreement. But the written, there was a written cooperation plea agreement in this case. There was. And it was a standard cooperation plea agreement, no promises given. Correct. Right. And so your theory really is that despite the fact that the government and the defense signed a written cooperation plea agreement, there was a secret, I suppose, oral agreement for a six-month deal. That's the defense theory. Yes. And this is a theory that isn't without both factual and legal precedent. We rely heavily and cite the Hayes case, which is an en banc case from this Court, where precisely that kind of thing happened. It's happened before, and I don't think there's any reason to suggest it couldn't happen again. It's part of our jurisprudence and, unfortunately, part of the history of this circuit, that these things do happen from time to time. And the two people who were allegedly participants in that secret plea agreement both put in declarations under oath that there was no such agreement. That's correct. Yeah. Consistent with their initial position. And I think perhaps part of the problem may arise that there is, I think, I don't know if the Court's, the Court probably is familiar with this phenomenon. There's always a bit of a dance in terms of persuading a person to cooperate while at the same time being careful not to promise anything. And I think that that's the kind of thing that led to the Hayes case initially, where there's at least some tacit agreement or a hint or implications that are given to the attorney but are then perhaps even shielded from the client. That was the actual fact pattern in the Hayes case. So it could be that this is a workaround where the client or the defendant, excuse me, the cooperator, I guess, in that context, is carefully shielded from the promises that were made, but rather there was a different understanding between the attorney and the government. Again, these are things that could have and might have been fleshed out in an evidentiary hearing or in the interrogatories. I see that I have two minutes. Unless there's questions, perhaps I'll reserve my time.  Good morning. May it please the Court. Justin Rhodes on behalf of the United States. Your Honors, this case rises and falls with the first prong of the Ndipui test, which is whether there was false testimony provided. And everything in the record, with the exception of one hearsay e-mail that is vague and itself actually shows a misunderstanding of the criminal law, everything else in the record suggests that there was no secret agreement. The plea agreement itself says that it is the sum total of the agreement between the parties. Both Mr. Johnson, as well as myself, and Mr. Johnson's attorney at the plea colloquy confirmed that. And then during trial, Mr. Johnson said there were no promises made. I'd like to take a little detour here and acknowledge that Mr. Johnson on the stand was possibly not the best witness at explaining what his plea agreement meant. But I would encourage the Court to look at the actual transcript of trial. And Mr. Werksman, who was then representing Mr. Fekrat, kept saying, but hasn't the government promised to do this for you, or haven't you made a promise of that? And Mr. Johnson truthfully said, no, no promises have been made. When it was unclear that exactly what a 5K agreement was, the parties drafted a stipulation, which I submit to you covers exactly the deal between the government. And then after trial, after Ms. Finch's email came out, both myself and Mr. Johnson's attorney, the person who is alleged to have made the statement, both denied under oath that it was made. As Judge Nguyen pointed out, that Mr. Hanslick then saw this email and decided that no new trial was merited. There's actually more than that, because Mr. Hanslick represented Mr. Fekrat for a period of time after trial, but actually not through sentencing, because Mr. Fekrat fired him. And then Mr. Fekrat brought on a man named George Buehler, who is on the CJA panel for our district. He looked at the record again. The best, and I think probably the only thing that Mr. Fekrat has in this case, is the Amber Finch email. Could have shut this whole thing down by getting a declaration from her, right? Your Honor, and I think any indications to why that wasn't done? Your Honor, in hindsight, I think that I certainly should have done that. Mr. Fekrat's 2255 was 12 pages of ineffective assistance relating to other issues. And the interrogatories are quite lengthy as to those other issues. Frankly, I didn't want to push my luck with Judge Anderson asking for a fourth declaration for another attorney who didn't represent him at trial and who was supervised directly by Mr. Hanslick. I submitted the declaration to Mr. Hanslick, asking both about his representation and new trial decisions, and asked him to comment on what he thought of this email from Ms. Finch. And that possibly I should have submitted an additional request for a declaration, but I, you know, at the time I thought that covered the ground. And possibly being the first ---- The cases have a tendency to change when they go to a higher court. Absolutely. We are familiar with that phenomenon. Absolutely, Your Honor. And possibly because I was very close to the issues and knew for certainty that no side agreement had been made. As to Judge Anderson's decision not to hold a hearing, possibly calling Ms. Finch, Judge Anderson was familiar with the following things. Chris Johnson. He had gone through an entire trial, first of all, with Chris Johnson as a defendant and Chris Johnson's attorney, John Luttrell. So and then Chris Johnson testified in the second trial. So Judge Anderson was well aware of who Chris Johnson was. He was familiar with myself, with Johnson's attorney. He was familiar with the plea agreement and the colloquy, because he took both of those. He was familiar with Johnson's demeanor while testifying and his answers. He was familiar with the way that Mark Worksman asked his questions. He was familiar with Amber Finch, who never made an appearance in the case, but he knew Jan Hanzlick and understood the role of Mr. Hanzlick because there was a lot of discussion about why Mr. Fekrat could fire Mr. Worksman and bring in new counsel and then fire Mr. Worksman and bring in a third set of lawyers. And that was an ongoing process with the district court. And finally, he was familiar with the weight of the evidence against Mr. Fekrat. And this goes to the issue of materiality. And what I think Mr. Scott passes over is that it wasn't just Mr. Johnson pointing the finger at Mr. Fekrat. In the first trial, it was Mr. Johnson alone. The government didn't have the phone records from Mr. Fekrat's house showing that phone calls were made to the minute with every single charge that went to American Express. And that evidence was some of the most damning evidence at trial, when you can line up a call from Mr. Fekrat's home to a number to American Express, to a charge, to a credit card number. In addition, the evidence at trial in the second trial came out that the credit card numbers that the two were using were credit cards belonging to people who American Express was able to prove had previously made purchases at two of Mr. Fekrat's stores. So what you have are people whose credit cards Mr. Fekrat has. There's charges from Mr. Fekrat's house to American Express matching up with his phone calls. And then at the end, you have Chris Johnson writing $90,000 worth of checks back to Mr. Fekrat. That evidence would have come in without a word from Chris Johnson, and that evidence was overwhelming. Now, Chris Johnson explained where they were, what – whose idea it was, how long they'd been talking about it. He did flesh it out. But – but Judge Anderson was – was well aware of the facts in the case and knew that even without Chris Johnson, there was substantial evidence. What Judge Anderson also knew is that Chris Johnson had been impeached six ways from Sunday. He was asked about all of his prior convictions, about his drug use, about his lies to the Secret Service, about inconsistencies he'd made, and about his motivation in testifying. And that came out both on direct and cross-examination, and it came out, frankly, in Mr. Worksman's closing. So taking all of those facts, Judge Anderson was well within his discretion to say, there is no hearing required. I can take the declarations, my knowledge of the trial, my knowledge of the persons involved, and come to the conclusion that a hearing would be futile. And I think the futility is emphasized even by the 2255 that the defendant did file. He said somewhat – I wasn't sure if it was he or one of his representatives – talk to Ms. Finch. And she said, my – my email means exactly what it means. So had there been a hearing, we can posit that Ms. Finch would take the stand and say, this is what John Luttrell told me. John Luttrell would then take the stand and say, there were no side agreements. I would take the stand and say, there were no side agreements. It would be an exercise in futility, because the cold record on the paper is, I submit to you, the same as what the record would be with witnesses. Now, the – the cases that the defendant has cited suggesting that a hearing is necessary, I would – I would like to talk about the Macabrota case from the Supreme Court. And it says that the issues raised by the motion are conclusively determined by the files and records in the trial court. And that's the standard you need to be able to decide no hearing is necessary. In that case, the Court said that that – that case was close to the line, close enough to the line that a hearing was necessary, but acknowledging that there are those cases that don't reach the threshold of needing a hearing. I would submit to you, Your Honors, that this case is nowhere near the line, that every single piece of solid, consistent, reliable evidence said that there was no side agreement, no secret agreement, except for one declaration from someone who, frankly, doesn't understand how the criminal process works and doesn't understand how cooperation agreements work and doesn't understand even what a pre-sentence report is. But counsel said that the record indicates that she was junior and inexperienced but doesn't otherwise have any factual basis, you know, how inexperienced Ms. Finch may have been. There is not anything in the record that sort of sets her law school graduation date or something like that. But – and, frankly, the e-mail that is attached is only one page. But if you read down to the initial part of the e-mail, which is Mr. Hanslick directing Ms. Finch what to do, he's saying, no, bear in mind, that's not what this document's for. This is your audience. This is what you're doing. And, you know, take out the zingers. Don't do this. And he's really guiding her. He's supervising her. And that was his role. Her role was to, I assume, draft initial documents, as a junior associate would do. And, you know, she – because Mr. Feckrath fired Mr. Hanslick before sentencing, we don't know if she would have argued at sentencing. But I submit to you, with Jan Hanslick above you, there was no chance she would have. But so Jan Hanslick looked at that and said there's no new trial needed. George Beeler looked at that and said there's no new trial needed. There just isn't anything in the record other than her misunderstanding. You know, a far more likely reading of this is that counsel talked after the pre-sentence report had come out and said, what are you going to recommend? Well, this is what I'm going to recommend. Okay. What are you going to recommend? And then that, you know, was conveyed to – because also, remember, what Ms. Finch's e-mail says is I talked to John Littrell. He didn't have his sentencing papers in front of him. So what he is trying to do is say what it was that the parties recommended and what did Johnson get. And so without his sentencing papers in front of him, he could say I think it was six months that we recommended. You recommended six months. The defense asked for probation. That's correct. I think the case that really, with respect to the idea of a hearing, the case really on point is Watts. And in that case, there was allegations of a secret agreement, and the district court took interrogatories, took evidence from the trial, took the district court's knowledge of the players involved, a couple of letters that had been submitted, and said that's enough. I can decide on this record. And that was affirmed by this court. And so unless the Court had further questions, I would just say that this e-mail is curious, no doubt. And I understand why Mr. Feckright has hung his hat on that e-mail. But when the e-mail is compared to every other thing in the record, including the source that spoke to Ms. Finch declaring under penalty of perjury that there was no side agreement, that was plenty for Judge Anderson to decide on the paper record, that no hearing was necessary, and that Petitioner's 2255 should be denied. Thank you. Thank you. Two points, Your Honors. First, I thank counsel for correcting me that Mr. Hanzlick did not represent Mr. Feckright at sentencing. He was fired before that ever happened. So I think that that fact completely undermines the notion that he would have filed something had there been a problem. He wasn't the attorney any longer. He had passed the file along by that point. So he's certainly not going to show up and file a motion for new trial in a case that he's not the attorney for. I would also suggest, and not suggest, I would state there isn't evidence that this e-mail was in front of the new attorney who represented Mr. Feckright at the hearing. So I just don't think that that's so to suggest that the new attorney had access to that information. So I think that completely undermines the Hanzlick argument that he would have done something. By then, he had been long fired. In terms of cumulative evidence, the government's cumulative impeachment that Mr. Johnson was impeached every way until Sunday, respectfully, that's factually not accurate because he waffled and denied and suggested that there wasn't benefits he was receiving to the extent that the government had to essentially enter a stipulation that that was somewhat mistaken. But more importantly, this Court has held repeatedly that if there are other grounds of impeachment that didn't come out at trial, not simply hitting on the same subject in more detail, which would be cumulative, but rather if there's new and other grounds for impeachment, then it is not cumulative. Now, the fact that there was affirmatively a six-month deal when he had denied that under oath and denied that under penalty of perjury to the jury, that is something other and different than what came out at trial. I cite to the Hayes case for the state of the law on cumulative as well as the 2005 case, Silva v. Brown. Thank you, Your Honors. Thank you. The matter is submitted.
judges: Schroeder, Pregerson, Nguyen